**Eric CHANEY, Deceased, Kathy and Rick Chaney, Co–Administrators, Appellants,**

v.

**DAGS BRANCH COAL COMPANY, and Hon. Marcel Smith, Administrative Law Judge and Workers' Compensation Board, Appellees.**

No. 2007–SC–000093–WC.

Supreme Court of Kentucky.

Jan. 24, 2008.

Glenn M. Hammond, Kristie Goff, Glenn M. Hammond Law Office, Pikeville, KY, for Appellant, Eric Chaney, Deceased, et al.

J. Gregory Allen, James William Herald III, Riley & Allen, PSC, Prestonsburg, KY, for Appellee, Dags Branch Coal Company.

## OPINION OF THE COURT

KRS 342.165(1) provides a 30% increase in compensation if an accident results in any degree from an employer's intentional failure to comply with any specific safety statute or regulation. An Administrative Law Judge (ALJ) determined that Eric Chaney's fatal accident resulted to some degree from a lack of warning devices but that the claimants failed to show the requisite intent. The Workers' Compensation Board affirmed in a 2–to–1 decision as did the Court of Appeals.

We reverse. An employer is presumed to know what specific state and federal statutes and regulations concerning work-

place safety require; thus, its intent is inferred from the failure to comply. If the violation "in any degree" causes a work-related accident, KRS 342.165(1) applies. The employer failed to place warning devices on the last row of permanent roof supports in violation of 30 C.F.R. § 75.208, and the evidence compelled a finding that the violation to some degree caused the fatal accident.

Eric Chaney was 26 years old. He had about two and one-half years' mining experience when hired as a utility worker in the defendant's underground coal mine. Eleven days later, on June 17, 2004, a section of the roof collapsed and killed him. The roof fall originated in an unsupported, just-completed crosscut and pulled two roof bolts out of the row closest to the cut. Chaney's body was found in by the second row of roof bolts (*i.e.*, between the two rows), crushed by a large piece of roof rock. The mine's approved roof control plan prohibited the continuous miner operator or others in the area from exposing "any portion of their body in by the second row of undisturbed permanent supports." Following investigations by federal and state authorities, the co-administrators of Chaney's estate alleged that his death was work-related and that it resulted from the employer's intentional safety violation.

A report by Franklin N. Strunk, District Manager of the federal Mine Safety and Health Administration (MSHA), stated that the roof fall occurred after the continuous miner completed a 35–foot extended cut, mining a crosscut between the Number 6 and Number 7 entries. The 20–foot entry and 20–foot crosscut widths complied with the approved roof control plan as did the size and spacing of the pillars (30–foot by 30–foot pillars on 50–foot by 50–foot centers) and the spacing of roof bolts (48–inch by 48–inch centers). The report noted that the plan permitted a 35–foot ex-tended cut to be made, but it required extra safety precautions because a typical cross cut at that mine left a 38–foot–long area unsupported until roof bolting was performed. The precautions included pro-hibiting any portion of the body to be positioned in by the second row of undis-turbed permanent supports (roof bolts) and requiring the continuous miner to be operated remotely. The report noted that when warning devices such as surveyors' ribbons are placed on the last row of roof bolts, miners are alerted to the location of unsupported roof, increasing the likelihood that they will be aware of the location of the second row of bolts when extended cuts are being mined. It also noted that 30 C.F.R. § 75.208 requires such a warn-ing device except during the installation of roof supports.

The MSHA report identified three causes of Chaney's death: 1.) the absence of standards, policies, and administrative controls at the mine to ensure that work-ers would not position themselves in by the second row of undisturbed permanent roof supports when an extended cut was being mined; 2.) the absence of a visible warning device to alert workers to the location of the last row of permanent roof supports; and 3.) the absence of a procedure to assign responsibility for installing warning devices. It noted that although some defi-ciencies existed in the employer's record-keeping, Chaney received the required six-teen hours of annual training. The report noted that the accident occurred when Chaney was positioned in by the second row of permanent roof supports, immedi-ately after an extended cut was mined. It concluded that the presence of a warning device would have increased the likelihood that he would have recognized his proximi-ty to the last row of roof bolts, but no such device was installed when an unsupported section of roof rock fell in by the second row of bolts and killed him.

The employer received two federal citations. First, it was cited for violating 30 C.F.R. § 75.220(a)(1) by failing to comply with the approved roof control plan. As corrective action, the roof control plan was reviewed and explained to every employee before mining was resumed. Second, it was cited for violating 30 C.F.R. § 75.208 by failing to have a readily visible warning device or a permanent barrier to impede travel beyond the end of permanent roof supports at the approach to the unsupported crosscut between the Number 6 and Number 7 entries. As corrective action, the report indicated that either the roof bolter operator or the continuous miner operator would "install bright red reflectors on the last row of permanent supports prior to the continuous mining machine beginning a new cut."

Tracy Stumbo prepared a fatal accident report for the Kentucky Office of Mine Safety and Licensing. It recommended placing warning markers on the second row of permanent roof supports before an extended cut is taken so that workers can readily see the restricted area. It also recommended that no one work or travel beyond the next-to-last row of permanent roof support while using the extended cut roof control plan. The report cited the employer for violating 805 KAR 7:030(1), by failing to document Chaney's sixteen hours of annual retraining, but noted that his death did not result from non-compliance. It also cited the employer for violating 805 KAR 5:070(15)(5) by failing to comply with its approved roof control plan because Chaney's body was located in by the second row of permanent supports.

When deposed, Stumbo testified that mine operators were required to submit a roof control plan, showing the mine's design, the width of the entries, the type of roof support to be installed, and the safety precautions to prevent roof falls. Stumbo testified that the regulations required a warning device to mark the last row of permanent roof supports. He stated that although the mine's roof control plan for an extended cut prohibited travel in by the second row of permanent roof supports, it contained nothing about warning devices. Questioned about the likelihood that a continuous miner would tear out ribbons placed on roof bolts before a cut was made, he testified that it would not pull out all types of warning devices and that warning devices were not always placed against the roof. He testified that the state did not recommend a particular method and that many mine operators placed them before taking the cut, while others placed them after the equipment was removed. He stated that agency required eight hours of classroom training annually and an additional eight hours of training at the mine site. As part of the latter requirement, mine operators usually reviewed the roof control plan with every individual.

Worley Taylor, a mine inspector for the Office of Mine Safety and Licensing, also participated in the accident investigation. He testified that he found no reflector ribbons around the roof bolts in the area where Chaney was killed. Asked why the agency failed to issue a citation on that basis, he replied that it expected them to be installed when the miner backed out after completing a cut. He noted that it did cite the employer for failing to comply with its roof control plan, which probably caused Chaney's death, and for failing to document that he received eight annual hours of retraining in addition to the eight documented hours of classroom retraining.

Johnny Mitchell testified that he was operating the continuous miner on the morning of June 17, 2004, cross cutting a seam of coal between the Number 6 and Number 7 entries. He explained that the miner is a large machine that is operated

remotely and that Chaney had been moving its cable. He stated that he told Chaney that he was finished and heard the rock fall as he was getting up to leave the area. Mitchell testified that warning devices show the location of the last row of bolts and help workers to avoid areas where the roof is unprotected. He did not recall whether any flags, markers, or other devices were in the area where the accident occurred and stated that the continuous miner sometimes tore them down. Although he had hung such devices on occasion, he had also seen the roof bolter hang them. He did not know who was responsible for doing so at the time of the accident and did not know whether it would have made any difference if a warning device had been placed on the last or next to last row of roof bolts. Mitchell stated that he had never seen Chaney do anything unsafe.

Johnny McHone was Chaney's section foreman on the date of the accident and was responsible for implementing safety provisions. He stated that when he marked the place where a crosscut was to be made, he sometimes hung reflectors as well, to mark the end of the secured area. He explained, however, that the roof in the area where the accident occurred was about 43 inches high and that the rotating head of the miner was about 36 inches in diameter. Thus, he sometimes waited to hang reflector ribbons until the miner completed the cut and backed out because the machine's head would drag them off the roof bolts. McHone stated that he visited the area of the accident before it occurred, and he did not recall that the last two rows of roof bolts were flagged or otherwise marked at that time. He stated that he would have hung reflectors after the miner backed out.

Herbert Hamilton, the mine superintendent, testified that his duties require him to know all state and federal safety laws and regulations and to assure that workers comply with them. Hamilton testified that the continuous miner was making extended cuts (*i.e.*, cuts of more than twenty feet) on the date of Chaney's accident. He explained that workers are not permitted to travel beyond the next to last row of permanent roof support when such a cut is made because traveling in by an unsupported roof exposes one to the risk of a roof fall. As a precaution, reflective warning markers are required on the next to last row of roof bolts. On regular cuts (*i.e.*, up to twenty feet), they are required on the last row of roof bolts. He explained subsequently that a reflector may be survey tape or anything with a reflective red color.

Hamilton stated that he did not understand why the mine was cited after Chaney's death for failing to mark the last permanent row of roof supports. He acknowledged that that the position of Chaney's body violated the roof control plan and that devices to warn workers not to travel under unsecured areas of the mine roof are an important safety precaution. He also acknowledged that there was adequate space for workers to be able to hang reflectors in the area where Chaney was killed. Hamilton stated that the mine's roof control plan required them to be hung on the last row of roof bolts in any area that was not being mined but that he considered mining to be in process when the accident occurred because the continuous miner had not backed out. Thus, the company hung reflectors after the miner backed out but before roof bolters reached the area. Roof bolters took them down after they set temporary roof supports.

Danny Justice was president of the company at the time of the accident. He testified that the approved roof control plan for an extended cut prohibited anyone

from traveling in by the second row of roof bolts but did not state when reflectors must be hung. He acknowledged that the federal report required reflectors to be placed on the last row of roof bolts before the miner begins to cut but noted the "very good possibility" that the miner would tear them down when making its cut.

The sole contested issue concerned the applicability of KRS 342.165(1). The claimants relied on the federal citations. They argued that the employer committed an intentional safety violation by failing to have the required warning devices in place and that the violation to some degree caused the fatal accident.

The employer maintained that the evidence failed to show an intentional safety violation. Relying on a notation found on the first page of the state accident report, it argued that Chaney actually received the required retraining. Addressing the state citation for failure to follow the roof control plan, the employer argued that Chaney was not ordered to go in by the second row of permanent roof support. The employer did not dispute the accuracy of the MSHA report that was filed into evidence, but it noted that no MSHA witness testified and asserted that the report was inadmissible.

The ALJ determined that the MSHA report was admissible as evidence under 803 KAR 25:010, § 14(2) as a public record. Finding it to be more persuasive regarding the retraining requirement because the federal inspectors received more documentation than the state inspectors did, the ALJ concluded that the employer did not violate a statute or regulation concerning retraining. Relying on the testimonies of Messrs. Stumbo and Taylor, the ALJ determined that Chaney was positioned in by the second row of roof bolts, which violated the roof control plan and

caused his fatal injuries, but concluded that the employer did not direct him to be there or fail to train him not to be there. The ALJ found that warning devices had not been placed on the second row of roof bolts at the time of the accident, that they would have warned Chaney not to travel in by the second row rather than the first row, and that their absence "to a degree" caused Chaney's death. Turning to whether the failure to place the devices before making the crosscut was an intentional safety violation, the ALJ noted that the MSHA cited the employer but that the state did not. Relying on Mr. Stumbo's testimony, the ALJ determined that the time for placing the devices was strictly a management call. The ALJ acknowledged that warning devices might have prevented the accident but was not convinced that the employer's conduct was egregious or that the employer ignored or willfully overlooked the hazard of waiting to place them until after the miner backed out. Convinced that no other employer action or inaction caused the accident, the ALJ concluded that KRS 342.165(1) did not apply.

KRS 342.165(1) states as follows:

*If an accident is caused in any degree by the intentional failure of the employer to comply with any specific statute or lawful administrative regulation made thereunder,* communicated to the employer and relative to installation or maintenance of safety appliances or methods, the compensation for which the employer would otherwise have been liable under this chapter shall be increased thirty percent (30%) in the amount of each payment. If an accident is caused in any degree by the intentional failure of the employee to use any safety appliance furnished by the employer or to obey any lawful and reasonable order or administrative regulation of the execu-

tive director or the employer for the safety of employees or the public, the compensation for which the employer would otherwise have been liable under this chapter, shall be decreased by fifteen percent (15%) in the amount of each payment. (emphasis added).

■ This case does not concern a violation of KRS 338.031, KOSHA's "general duty" provision; therefore, *Cabinet for Workforce Development v. Cummins,* 950 S.W.2d 834 (Ky.1997); *Apex Mining v. Blankenship,* 918 S.W.2d 225 (Ky.1996); and *Lexington–Fayette Urban County Government v. Offutt,* 11 S.W.3d 598 (Ky. App.2000), and similar authority are of limited value. KRS 342.165(1) does not require an employer's conduct to be egregious or malicious. Absent unusual circumstances such as those found in *Gibbs Automatic Moulding Co. v. Bullock,* 438 S.W.2d 793 (Ky.1969), an employer is presumed to know what specific state and federal statutes and regulations concerning workplace safety require. Thus, its intent is inferred from the failure to comply with a specific statute of regulation. If the violation "in any degree" causes a work-related accident, KRS 342.165(1) applies. *AIG/AIU Insurance Co. v. South Akers Mining Co., LLC,* 192 S.W.3d 687 (Ky.2006), explains that KRS 342.165(1) is not penal in nature, although the party that pays more or receives less may well view it as such. Instead, KRS 342.165(1) gives employers and workers a financial incentive to follow safety rules without thwarting the purposes of the Act by removing them from its coverage. It serves to compensate the party that receives more or pays less for being subjected to the effects of the opponent's "intentional failure" to comply with a safety statute or regulation.

Both state and federal regulators cited the employer for violating its approved roof control plan because Chaney's body was found in by the second row of permanent roof supports (*i.e.,* roof bolts). Nearly identical state and federal regulations concerning devices to warn workers of their proximity to unsupported roof existed, but the agencies interpreted them differently. The MSHA cited the employer for violating 30 C.F.R. § 75.208, which states as follows:

**Warning devices:**

Except during the installation of roof supports, the end of permanent roof support shall be posted with a readily visible warning, or a physical barrier shall be installed to impede travel beyond permanent support.

In contrast, the Kentucky Office of Mine Safety and Licensing determined that the employer did not violate 805 KAR 5:070. It states, in pertinent part, as follows:

Section 10. Warning Devices. Except during the installation of roof supports, the end of permanent roof support shall:

(1) Be posted with a readily visible warning; or

(2) Have a physical barrier installed to impede travel beyond permanent support.

■ KRS 342.165(1) applies to an intentional violation of "any" specific safety statute or lawful administrative regulation. The courts generally give great deference to an administrative agency's interpretation of its own regulations. But even if we were to agree for the purpose of discussion that the Office's interpretation of 805 KAR 5:070 is correct, that interpretation is not conclusive as to whether the employer intentionally violated 30 C.F.R. § 75.208. The MSHA interprets 30 C.F.R. § 75.208 in a manner that is consistent with its plain language and its apparent purpose, which is to alert workers of their proximity to the end of permanent roof support ex-

cept when roof supports are being installed. The MSHA determined not only that the employer failed to install the required warning devices but also that it failed to establish a procedure to assign responsibility for installing them and to adopt standards, policies, and administrative controls to ensure that workers would not position themselves in a hazardous area when an extended cut was being mined.

The mine's roof control plan required permanent roof supports to be installed 48 inches apart. Substantial evidence supported the ALJ's finding that the accident resulted to some degree from the absence of warning devices on the second row of roof bolts. Nothing refuted the evidence that warning devices marking the last row of roof support would also have helped alert Chaney to his proximity to unsupported roof and helped to prevent him from traveling within 48 inches of the last row of roof support (*i.e.,* in by the second row). The accident occurred after the miner completed a 35–foot by 20–foot crosscut, at a time when nothing marked either the last or the second last row of roof support at the entry to the crosscut and when the installation of roof supports had not begun. Under the circumstances, the evidence compelled a finding that the accident resulted to some degree from the employer's intentional failure to comply with 30 C.F.R. § 75.208.

The decision of the Court of Appeals is reversed, and this claim is remanded to the ALJ to award a 30% increase in compensation.

All sitting. All concur.