Patricia HORNBACK, Appellant

v.

HARDIN MEMORIAL HOSPITAL; Honorable Caroline Pitt Clark, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2012–SC–000195–WC.

Supreme Court of Kentucky.

May 23, 2013.

As Modified on Denial of Rehearing Oct. 24, 2013.

Christopher P. Evensen, Louisville, Counsel for Appellant.

Timothy Joe Walker, Mark Edward Yonts, Lexington, Counsel for Appellee Hardin Memorial Hospital.

Mary Michele Cecil, Owensboro, Counsel for Amicus Curiae, Kentucky Chapter of American Federation of Labor and Congress of Industrial Organizations.

## OPINION OF THE COURT

Patricia Hornback requests this Court reverse an opinion of the Court of Appeals, which held that she was not entitled to an enhancement of her workers' compensation award pursuant to KRS 342.165(1), which penalizes an employer for an intentional failure to follow a safety protocol. She makes the following arguments on appeal: (1) that her employer, Hardin Memorial Hospital ("Hardin"), is barred from raising certain issues on appeal because it failed to ask the Administrative Law Judge ("ALJ") for further findings of fact; (2) that the ALJ's finding that a safety procedure pamphlet written by an elevator manufacturer was a safety protocol policy for Hardin was supported by the evidence; (3) that the ALJ correctly applied the four-part test set forth in *Lexington–Fayette Urban County Government v. Offutt*[1] to determine that Hardin violated the "general duties" provision of Kentucky's Occupational Safety and Health Act; and (4) that the Court of Appeals erred in holding that the ALJ needed to make an independent finding of intent to apply the enhancement set forth in KRS 342.165(1). Hardin concedes that Hornback is entitled to permanent total disability benefits at this time but believes that the ALJ's enhancement of her award was unsupported by the facts. For the reasons set forth below, we reverse the Court of Appeals.

While working for Hardin as a custodian, Hornback became trapped in a stalled

1. 11 S.W.3d 598 (Ky.App.2000).

elevator. Hardin's security staff attempted to rescue Hornback; but, as a result of their attempt, she fell several stories down the elevator shaft causing serious injuries to her person. Hornback has been unable to work since the injury, and she filed for workers' compensation.

■ The ALJ enhanced Hornback's workers' compensation award based on KRS 342.165(1) and KRS 338.031. Under KRS 342.165(1), if an accident is caused in any degree by the intentional failure of an employer to comply with a specific statute or regulation relative to the installation or maintenance of safety appliances, or methods, the claimant's workers' compensation benefits shall be increased by 30 percent in the amount of each payment. The benefit enhancement provided in KRS 342.165(1) can be triggered by a violation of KRS 338.031, also known as the "general duties" provision of Kentucky's Occupational Safety and Health Act, which states that an employer must provide his employees a place to work free from recognized hazards that could cause death or serious injury. *Offutt* provides a four-part test to determine whether an employer violated KRS 338.031.[2] That test is:

(1) [a] condition or activity in the workplace presented a hazard to employees; (2) [t]he cited employer or employer's industry recognized the hazard; (3) [t]he hazard was likely to cause death or serious physical harm; and (4) [a] feasible means existed to eliminate or materially reduce the hazard.[3]

Applying the above statutes and the *Offutt* test, the ALJ made the following findings and legal conclusions regarding the accident:

[b]usiness records from [Hardin] include a document entitled 'How to operate Elevators under emergency conditions,' which lists specific procedures for dealing with an individual stuck on an elevator. The document specifies the exact procedures a 'certified rescue squad' is to utilize in removing individuals from elevators which are malfunctioning. Specifically, emergency removal of passengers is to be performed by a fire department or rescue squad when an elevator has stopped between floors. Further, a 'qualified elevator mechanic' is to be called to determine if the elevator can be made operational first, before attempting to remove passengers. Then, the first procedure for removing passengers is to remove them from the side emergency exit into an adjacent elevator. In all cases, a fire department or rescue squad is to be called to perform all rescue activities.

Based on the findings in the Kentucky OSHP Report, it appears [Hornback] used the elevator phone to call for help when she realized that she was stuck. At that point, [Hardin], through its hospital security team, violated every single safety instruction set forth in its procedure for 'How to operate Elevators under emergency conditions.' [Hardin] did not call the fire department or a certified rescue squad, and did not call a qualified elevator mechanic. Instead, [Hardin] attempted to extract [Hornback] on their own, but instead of using an adjacent elevator so she could exit through a side emergency door (i.e. avoid the risk of falling down an 'open' elevator shaft), the hospital personnel opened the elevator door from the front, and attempted to have her jump out of the elevator next to an open elevator shaft. When [Hornback]'s feet hit the ground, her knees buckled and she fell

**2.** *Id.*

**3.** *Id.* at 600 (footnote omitted).

backwards into and down the elevator shaft. Only then were emergency personnel alerted, and thereafter the fire department arrived on scene to conduct the rescue.

The Kentucky OSHP Report reflects that Hospital management acknowledged it did not follow safe rescue procedures, indicating 'if it happened again in the future. The Fire Department would conduct the rescue.'

Turning back to the four (4) questions posed in *Offutt:* (1) Did the condition or activity present a hazard to the employee? The answer to this question is 'yes.' [Hardin]'s activity of ignoring their own safety procedures and attempting to remove a person from a malfunctioning elevator with an unrestricted 'open' elevator shaft just a foot or two away presented a grave hazard to [Hornback]. (2) Did the employer's industry generally recognize this hazard? Again, the answer to this question is 'yes.' That is why [Hardin] had in its possession documentation of exactly how to safely remove individuals from a malfunctioning elevator stopped between floors. (3) Was the hazard likely to cause death or serious physical harm to employee? The answer to this third question is also 'yes.' Removing an individual from an elevator with an exposed and open elevator shaft just a foot or two away, which the individual could fall down, without blocking the open elevator shaft or securing the individual, clearly sets the scene for a devastating injury, which is exactly what happened in this instance. (4) Did a feasible means exist to eliminate or reduce the hazard? Lastly, the answer too is 'yes.' Not only did a feasible means exist to eliminate the hazard, [Hardin] had an entire policy on how to safely extract people from elevators stuck between floors. [Hardin] simply refused to adhere to its own safe-ty policy, resulting in [Hornback]'s significant injuries.

Based on these findings and legal conclusions, the ALJ applied the 30 percent enhancement to Hornback's weekly income benefits. The Workers' Compensation Board affirmed.

The Court of Appeals, however, reversed holding that the record did not support the conclusion that Hardin violated the *Offutt* test—specifically, it found that Hardin's actions did not violate the first and second factors. The opinion stated that " 'a condition or activity' as contemplated by *Offutt,* does not include the one-time malfunctioning of an elevator. It was an unanticipated event responded to by employees without direction from Hardin." The opinion then found that there was insufficient evidence to show that the "How to Operate Elevators under Emergency Conditions" pamphlet was a hospital safety policy or that becoming stuck in an elevator is a hazard associated with employment in a hospital. The Court of Appeals concluded that for Hornback to receive the enhancement provided by KRS 342.165(1) two elements had to be satisfied: (1) a violation of 338.031(1)(a) and (2) an intentional violation. Thus, the Court of Appeals believed there must be a finding that Hardin "ignored or willfully overlooked a safety hazard that was reasonably foreseeable." Hornback subsequently filed the present appeal.

## I. HARDIN'S PETITION FOR RECONSIDERATION DID CHALLENGE THE ALJ'S FACT FINDING.

Hornback first argues that Hardin is barred from raising certain arguments on appeal because its petition for reconsideration failed to request further findings of

fact on several issues.[4] Specifically, Hornback contends that Hardin did not request further findings of fact regarding whether the elevator safety pamphlet was a policy or procedure of the hospital and whether the hospital intentionally violated its own policies and procedures. However, a quick review of Hardin's petition for reconsideration and Hornback's response to the petition refutes this argument.

Hardin's petition clearly stated that it believed the ALJ incorrectly found that the "How to Operate Elevators under Emergency Conditions" pamphlet was a safety protocol procedure for the hospital and that the ALJ failed to make a finding that Hardin intentionally violated a safety protocol. Hornback's reply included a response to those arguments—in particular, one of those arguments is entitled "THIS ALJ PROPERLY FOUND, WITHIN HER DISCRETION AND BASED ON SUBSTANTIAL EVIDENCE, THE EMPLOYER COMMITTED AN INTENTIONAL SAFETY VIOLATION." If Hornback read Hardin's petition for reconsideration and understood that it was attacking the conclusion that the elevator safety pamphlet was a hospital procedure and that an intentional safety violation occurred, then we believe the ALJ did the same. There is no merit to this argument.

## II. THE COURT OF APPEALS DID NOT USURP THE ALJ'S DISCRETION AS FACT FINDER.

■ Hornback next argues that the Court of Appeals impermissibly substituted its judgment for that of the ALJ by finding that there was insufficient evidence

to show that the "How to Operate Elevators under Emergency Conditions" pamphlet was a hospital safety policy. Hornback contends that the fact that Hardin had the pamphlet on hand and turned it over during discovery as a business record indicates that it was an adopted safety policy.

■ The ALJ has sole discretion to evaluate the weight of the evidence presented.[5] In reviewing the fact finding of an ALJ, the Court of Appeals determines if the findings are supported by substantial evidence.[6] *Substantial evidence* is defined as "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[7]

In this matter, we must agree with the Court of Appeals that the ALJ's conclusion that the "How to Operate Elevators under Emergency Conditions" pamphlet was the adopted safety policy of Hardin is not supported by substantial evidence. It appears as though the ALJ presumed that because Hardin had the elevator safety pamphlet on hand and turned it over during discovery, it was an adopted safety procedure. But there is no concrete evidence or testimony to support this conclusion. Just because Hardin kept the elevator safety pamphlet given to it by the manufacturer does not mean it was ever used or adopted by Hardin's management as a protocol. The Court of Appeals did not impermissibly substitute its judgment for that of the ALJ.

However, despite the fact that there was insufficient evidence to find that the pam-

---

**4.** *See Eaton Axle Corp. v. Nally,* 688 S.W.2d 334 (Ky.1985) (holding that failure to request a petition for reconsideration on factual issues waives appeal of those findings).

**5.** *Whittaker v. Rowland,* 998 S.W.2d 479, 481 (Ky.1999).

**6.** *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky.1986).

**7.** *Smyzer v. B.F. Goodrich Chemical Co.,* 474 S.W.2d 367, 369 (Ky.1971).

phlet was the safety protocol for Hardin, there is more than sufficient reason to reverse the Court of Appeals as discussed below.

## III. THE ALJ REACHED THE CORRECT RESULT USING THE *OFFUTT* TEST.

■ Hornback next contends that the ALJ correctly applied the four-part test set forth in *Offutt* to determine that Hardin violated the "general duties" provision of Kentucky's Occupational Safety and Health Act, KRS 338.031. This finding allowed the ALJ to enhance Hornback's weekly income benefits pursuant to KRS 342.165(1). The Court of Appeals, however, believed that the severity of any potential violation that Hardin committed did not rise to the egregious level of violations found in other cases dealing with KRS 338.031.[8] Further, as stated above, the Court of Appeals did not believe that a one-time malfunction of a stalled elevator that trapped an employee was a "condition or activity [which] constituted a hazard to employees" or that removing an individual from a stalled elevator was a hazard traditionally associated with hospital employment.[9] Therefore, the Court of Appeals found that Hornback did not satisfy the first two of the *Offutt* test factors. We disagree and will now perform our own *Offutt* analysis.

The first inquiry is whether a condition or activity in the workplace presented a *hazard* to employees. The obvious answer here is yes. Hornback was an employee of Hardin and was trapped in a stalled elevator. While we agree with the Court of Appeals that there was insufficient proof to show that Hardin adopted the elevator manufacturer's safety pamphlet as a policy or procedure, the fact that the manufacturer produced such a document shows that a stalled elevator presents a dangerous condition. As stated in the pamphlet, "[a]lthough elevators are the safest form of public transportation, any attempt by unqualified personnel to use methods to circumvent safety devices can result in serious injury or fatalities." The pamphlet, in touting the low number of injuries that occur during elevator rescues, further stated that "[w]e believe this fine safety record can be attributed only to the fact that the entire operation was supervised by properly trained mechanics, aware of all of the hazards involved in removing passengers from stalled elevators under these emergency conditions." It seems clear that having an employee in a stalled elevator presents a hazard to that individual, especially if the rescue staff is unaware of proper safety procedures. As the owner of a property with an elevator, Hardin had to be aware of the risks associated with elevator rescues.

The second *Offutt* inquiry is whether the cited employer or employer's industry recognized the hazard. Again, the answer to this question is yes. All elevators run the risk of stalling and trapping passengers. The realization that this does occasionally happen caused the elevator manufacturer to write the safety pamphlet.[10] We find that a hospital—which is usually the place that a person injured in a negligent elevator rescue goes for treatment—had to have known, or at least should have been

---

8. *See Brusman v. Newport Steel Corp.*, 17 S.W.3d 514, 520 (Ky.2000); *Apex Mining v. Blankenship*, 918 S.W.2d 225 (Ky.1996).

9. *Offutt*, 11 S.W.3d at 599.

10. The safety pamphlet states that it was written because "[o]ver the years, we have had requests from Building Owners or Managers, Police, Fire or Building Department Officials for instructions on removal of passengers from stalled elevators with the greatest possible safety."

aware, of the hazards of rescuing an employee from a stalled elevator. We note that in *Offutt*, the fact that an article was distributed to supervisors warning of the dangers of heat-related strokes was sufficient to put the employer on notice of the hazard.

The third factor is whether the hazard was likely to cause death or serious physical harm. The obvious answer is yes, proven by the serious injuries Hornback suffered due to the unsuccessful rescue attempt.

Finally, the fourth factor is whether feasible means existed to eliminate or materially reduce the hazard caused by a stalled elevator. The answer is again yes. Had the hospital used the safety procedure pamphlet methods to conduct the rescue or at least called trained emergency personnel, this accident could have been avoided. While the intentions of Hardin's safety officers were noble, it was clear that they were not trained in the proper procedure of removing trapped individuals from a stalled elevator.

Finding that all of the *Offutt* factors are satisfied, we agree with the ALJ's conclusion that Hardin violated the "general duties" provision of KRS 338.031(1)(a). A violation of that statute can satisfy the requirement in the weekly benefit enhancement provided in KRS 342.165 that a "specific statute" was intentionally ignored. Not all violations of KRS 338.031(1)(a) automatically rise to a violation egregious enough to justify granting an enhancement under KRS 342.165.[11] Although some of our opinions have found the employer's egregious behavior to trigger enhancement,[12] "KRS 342.165(1) does not require an employer's conduct to be egregious or malicious."[13] In order for a violation of the general-duty provision to warrant enhancement under KRS 342.165(1), the employer must be found to have intentionally disregarded a safety hazard that even a lay person would obviously recognize as likely to cause death or serious physical harm.[14]

In this matter, it seems clear that this standard has been met. The danger presented by counseling an employee to jump from an elevator suspended between floors, leaving the elevator shaft exposed below, is easily recognizable to any person as a condition likely to cause death or serious physical harm. Moreover, Hardin's possession of the elevator safety pamphlet further evidences Hardin's notice of the dangers inherent in elevator

---

11. *See Cabinet for Workforce Development v. Cummins*, 950 S.W.2d 834, 836 (Ky.1997) ("Nowhere did we state or imply that every violation of KRS 338.031(1)(a) constituted the violation of a specific safety statute for the purposes of KRS 342.165.").

12. *Blankenship*, 918 S.W.2d 225 (finding an intentional violation where an employer failed to repair a grader with defective brakes, a throttle that was tied fully open, and a defective decelerator). *But see Brusman*, 17 S.W.3d at 520 ("Although the evidence in this case was not as egregious as in *Apex Mining v. Blankenship*, it was substantial and sufficient to support the ALJ's award of a 15% penalty.").

13. *Chaney v. Dags Branch Coal Co.*, 244 S.W.3d 95, 101 (Ky.2008).

14. *Omico Plastics v. Sparkle Acton*, 2009 WL 427386, at *4 (Ky.2009); *see also Cummings*, 950 S.W.2d at 836 (noting the importance of the patent condition of the hazard, as well as the employer's knowledge of the hazard in deter Mining whether a violation was intentional); *Scruggs v. Westlake PVC Corp.*, 2012 WL 5990280 (Ky.2012) (holding no intentional violation of KRS 338.031 because the employer was unaware of the hazard that caused the employee's injury).

rescues.[15] Hardin's failure to take any prophylactic measures prevent Hornback from suffering her ultimate fate of falling into the open elevator shaft can only be considered to be an intentional disregard of a safety hazard that is easily recognizable as likely to cause death or serious injury when viewed in light of the patent nature of the risk and the grave potential harm.

Therefore, we agree with Hornback that the ALJ properly applied the 30 percent enhancement to her weekly benefit because of Hardin's violation of KRS 342.165.

## IV. THERE IS SUFFICIENT EVIDENCE TO PROVE HARDIN INTENTIONALLY VIOLATED KRS 338.031(1)(a).

 Finally, Hornback argues that the Court of Appeals incorrectly held that the ALJ had to make a specific finding of fact that Hardin's alleged safety violation was intentional. The Court of Appeals stated that to show a violation of KRS 342.165(1), the ALJ had to make a specific finding that Hardin "ignored or willfully overlooked a safety hazard that was reasonably foreseeable." Although we have articulated a slightly different standard above, we nonetheless agree with the Court of Appeals that an employer's intentional violation must be proven before the enhancement provided in KRS 342.165(1) can be applied. However, the ALJ's opinion clearly states that "[b]ased on a review of the evidence presented in this case, as discussed directly above, the [ALJ] is convinced [Hardin] committed an intentional safety violation that resulted in [Hornback's] injuries." Therefore, the ALJ did make a specific finding that Hardin committed an intentional violation. Further,

as discussed above, there is sufficient evidence that Hardin intentionally disregarded the safety hazard that can occur if an elevator stalls by failing to take appropriate preventative measures to prevent or reduce the risk of injury.

## V. CONCLUSION.

For the reasons set forth above, the decision of the Court of Appeals is reversed; and the opinion and award of the Administrative Law Judge is reinstated.

All sitting. All concur.

---

15. Consistent with our holding above, the pamphlet is not being treated as Hardin's policy. Nonetheless, Hardin's decision to re-tain the pamphlet in its records is indicative of Hardin's understanding of these dangers.